THE STATE OF KANSAS, *on the relation of S. B. Bradford, Attorney General,* v. A. F. MALO, *as Sheriff of Gray County, et al.*

COUNTY-SEAT ELECTION — *Gross Frauds — Particular Place should be Held to be the County Seat, When.* In an action involving the question of the result of a county-seat election, in which election gross frauds and irregularities occurred, but where it can be ascertained from the evidence that a particular place received a majority of all the votes actually cast, a majority of all the votes cast by legal voters, and a majority of all the votes cast by honest voters, such place should be held to be the county seat. And this is especially true where the principal frauds and irregularities were committed by the friends of the other place.

*Motion for Rehearing.*

THE material facts are stated in *The State v. Malo,* ante, pp. 54, *et seq.,* and in the opinion herein, filed on October 5, 1889.

*Johnson, Martin & Keeler, Waters, Chase & Tillotson, Edwin A. Austin,* and *A. J. Bryant,* for plaintiff.

*G. W. Dunn, M. W. Sutton, J. T. Whitelaw,* and *C. N. Sterry,* for defendants.

The opinion of the court was delivered by

VALENTINE, J.: This case was decided by this court on June 7, 1889, and on June 13, 1889, a motion for a rehearing was made by the plaintiff, and on July 3, 1889, such motion was submitted for consideration to this court, and we now proceed to consider the same.

Gray county was organized in July, 1887. Pending the proceedings for its organization, the principal contestants for the temporary county seat were the towns of Cimarron and Montezuma. The votes for temporary county seat as returned by the census-taker were as follows: For Cimarron, 705 votes; for Montezuma, 500 votes; for Ingalls, 88 votes; for Stowe, 1 vote; and for the center of Gray county, 1 vote. Upon the votes as thus returned the governor declared Cimarron to be

the temporary county seat. The temporary board of county commissioners divided the county into six municipal townships, as follows: Cimarron, Montezuma, Ingalls, Hess, Foote, and Logan. On October 31, 1887, an election was held in the county, including the aforesaid townships, for the purpose, among others, of permanently locating the county seat; and afterward the canvassing board, two of whom were strong partisans of Cimarron, declared the result with reference to the county seat to be as follows:

|  | INGALLS. | CIMARRON. |
|---|---|---|
| Cimarron | 45 | 494 |
| Montezuma | 236 | 30 |
| Ingalls | 143 | 17 |
| Hess | 195 | 60 |
| Foote | 25 | 117 |
| Logan | 69 | 35 |
| Totals | 713 | 753 |

The foregoing statement does not at all express the true result of the election. Of the 753 votes counted for Cimarron, about 100, and probably many more, were never cast at all; and a great many more of them were not cast for Cimarron, but were cast for Ingalls. The frauds causing this false counting were perpetrated principally, if not entirely, by the election officers in the two townships of Cimarron and Foote. Beyond all question Ingalls was in fact chosen by the electors at this election to be the county seat of Gray county. If all the votes actually cast at that election were counted, Ingalls would have a majority. If all the votes cast by the legal voters only were counted, Ingalls would still have a majority. If all the votes cast by such of the legal voters only as were not influenced by bribes, nor by any other corrupt or illegal means, were counted, Ingalls would still have a majority. And if all the honest and legal votes cast, and no others, were counted, Ingalls would still have a majority. On November 8, 1887, a full set of county officers was elected for the county, and after qualifying and entering upon the discharge of their duties, they removed their offices to Ingalls, and have since held them at that place as the county seat. Afterward, and on March 14, 1888, this action was commenced in this court.

The action is *mandamus* to compel the county officers of Gray county to remove their offices from Ingalls to Cimarron as the county seat. The title to the action, giving the names of the parties, is as follows:

"*The State of Kansas, ex rel. S. B. Bradford, Attorney General, Plaintiff, v. A. F. Malo, as Sheriff of Gray County, Kansas;* J. L. Cailey, as Clerk of the District Court; George B. Antrim, as County Clerk; J. B. Williams, as County Treasurer; E. J. Clark, as Register of Deeds; F. P. Hammer, as Superintendent of Public Instruction; J. R. Brady, as Probate Judge; J. L. Bower, as County Surveyor; George W. Dunn, as County Attorney of Gray County, *Defendants.*"

The attorney general has taken no part in the action, except merely to permit his name to be used. The pleading of the plaintiff, to wit, the alternative writ of *mandamus*, alleged the holding of the foregoing election on October 31, 1887; that it was duly and regularly held in the county and in all the election precincts, and that it was legal and valid; and that by it Cimarron became the permanent county seat of Gray county. Additional matters were also alleged sufficient to make out a *prima facie* case in favor of the plaintiff and against the defendants. The plaintiff did not however allege that any fraud or illegality or irregularity occurred at such election in the county, or in any one or more of the election precincts; but, on the contrary, alleged otherwise as aforesaid.

The defendant Bower answered that the allegations of the alternative writ were true, and that he had obeyed the command of the writ. The other defendants answered, admitting substantially all the allegations of the alternative writ, except that the aforesaid election resulted in the choice of Cimarron as the county seat, and alleged that it resulted in the choice of Ingalls as the county seat; and further alleged that great frauds, illegalities and irregularities were perpetrated by the friends of Cimarron in conducting and carrying on the election in Cimarron and in Foote townships, sufficient to invalidate the election in such townships; and also alleged that several illegal and fraudulent votes were cast for Cimarron in Logan

township. All these matters are set forth in great detail in the defendants' answer.

The only questions presented by the pleadings, as will be seen from an inspection thereof, are as follows: Were there any such frauds, illegalities and irregularities in Cimarron, Foote, and Logan townships as are alleged and set forth in and by the defendants' answer to the alternative writ?

On July 6, 1888, the court, with the consent and at the suggestion of the parties, appointed F. E. Carringer as a commissioner of the court to take the testimony in the case, which he was to do and report the same to the court by September 15, 1888. On September 4, 1888, it was ordered by the court that the taking of the evidence, which was not yet completed, should be closed on or before September 29, 1888, and the case was set down for hearing on October 5, 1888. When October 5th arrived, the parties were not ready, and by stipulation of counsel the case was continued and the hearing thereof set for January, 1889. By a subsequent agreement of the parties the case was again continued, and set for hearing on April 2, 1889. And by order of the court the taking of the evidence, which was not yet completed, was to be closed on or before February 25, 1889. The taking of the evidence was so closed, and the commissioner who took the evidence filed his report thereof in the court on April 1, 1889.

It appears that but little effort was made by the parties to bring the case to an early hearing upon its merits and upon the evidence, but during its pendency three different efforts were made at different times to have the court order, without evidence, that the county officers, or some one or more of them, should remove his office, or their offices, from Ingalls to Cimarron, and there hold the same as at the county seat. The last of these efforts was made in February, 1889, after nearly all the evidence in the case had been taken by the commissioner. Finally April 2, 1889, arrived, and the parties on that day and the next day submitted their case to the court upon the written evidence previously taken and filed in the court. The oral argument was before the commissioners ap-

The State, *ex rel.*, v. Malo.

pointed under the act of·the legislature of February 24, 1887, creating a commission for the supreme court.    Each side was given five hours for oral argument.    The commissioners heard the oral argument, and read the evidence and the briefs, and came unanimously to the conclusion that by the election held in Gray county on October 31, 1887, Ingalls was chosen by the electors of that county to be the permanent county seat of the county.    They made their report accordingly to the judges of the court, and a majority of the judges approved their conclusions, and ordered that an opinion be prepared in the case.    This was on May 1, 1889.    In pursuance of the foregoing order, Commissioner SIMPSON prepared an opinion, and afterward submitted it to the judges; and on June 7, 1889, the court rendered judgment in accordance with the recommendation of the opinion in favor of the defendants, and denying a peremptory writ of *mandamus;* the Chief Justice dissenting, and delivering a dissenting opinion.    A motion for a rehearing has now been made, and presented by the plaintiff to the court, upon the following grounds, to wit:

"1. That said decision is not sustained by sufficient evidence, and is contrary to law.

"2. For error of law occurring at the trial, and excepted to by plaintiff."

The second ground for a rehearing is inapplicable, for the reason that nothing was excepted to during the trial.

Upon the oral argument on the hearing of this motion for a rehearing, *and for the first time by any party to the action,* it was claimed that there was no valid election held in Gray county at the time of the holding of the county-seat election, on October 31, 1887.    Up to the time of the hearing of this motion no such claim was ever made by any party to the action, but on the contrary, it was claimed by the plaintiff that the aforesaid election was valid, and that by it Cimarron became the permanent county seat of Gray county; while the defendants claimed that the election was valid, and that by it Ingalls became the permanent county seat of the county. By this new claim, made on the rehearing, it is desired to dis-

franchise all the innocent and honest voters of Gray county, as well as the dishonest and guilty; and evidently the former class of voters vastly outnumbers the latter class. But even if not, still why should not the honest voters rule? This new claim made now by the plaintiff for the first time is wholly outside of the issues in the case made by the pleadings of the parties, and is evidently made for the reason that it has now been discovered that upon any fair count of the votes that were actually cast at the aforesaid election of October 31, 1887, Ingalls received a clear majority. But still we shall consider the claim. But first there are some preliminary matters to be considered, with reference to frauds and irregularities claimed to have been brought about or committed by the friends of Ingalls, all of which frauds and irregularities, claimed to have been committed on the part of Ingalls or its friends, are wholly outside of the issues in the case. The only frauds committed by any of the election officers at the election of October 31, 1887, were committed in the two townships controlled by the friends of Cimarron, to wit, in Cimarron and in Foote townships. No frauds were committed by any of the election officers in any of the four townships controlled by the friends of Ingalls. Perhaps, however, we should here make an explanation. It is true that one of the judges of the election in the township of Montezuma had some suspicions on the day of the election that some of the voters were being bribed, both to vote for Ingalls and to vote for Cimarron, but these were only suspicions; and as there were persons friendly to both of these places standing at the polls for the special purpose of challenging every person offering to vote who might not be a legal or honest voter, he did not do any of the challenging. Of course, if a person offering to vote was challenged by any person, then it was unnecessary for any one of the judges of the election to do so; and if none of the regular challengers challenged a voter, all the judges of the election had the right to presume that the voter was a legal and qualified voter. With this explanation we shall not refer to this matter again. In Cimarron township various villainies were

perpetrated.   Indeed, the returns from that township were false and fraudulent, and largely, if not entirely, forged.   They should never have been canvassed by the canvassing board, and perhaps would not have been canvassed except for the fact that two of the county commissioners constituting the canvassing board were strong partisans of Cimarron.   On account of the frauds of the election officers and others in Cimarron and Foote townships, the returns from those two townships must be considered as wholly and absolutely worthless as evidence; while, as no frauds were committed by the election officers in the other four townships, and as the election in the other four townships was conducted fairly and honestly, so far as the officers were concerned, the returns from those four townships must be considered as *prima facie* evidence of what they purport to show, and nothing has been introduced sufficient to overturn or destroy the *prima facie* character of these returns from these four townships.   But some of the facts which might be inferred from these returns have .been overturned. These matters we shall now consider.

Evidence has been introduced tending to show that individual voters were bribed with money to vote both for Ingalls and for Cimarron, and were influenced by the promised construction of a railroad to vote for Ingalls.   The principal persons engaged in bribing and influencing voters to vote for Ingalls were Asa T. Soule and his agents.   Soule is a very wealthy man residing at Rochester, New York, and his agents who were engaged in this business are principally, if not entirely, non-residents of Gray county.   The bribing on the part of Ingalls was nearly all done in Cimarron township, though some of it was done in some of the other townships.   But let the vote of every person voting for Ingalls in Cimarron township and in every other township against which the evidence casts the slightest suspicion of having received a bribe be stricken out, and the result of the election would be precisely the same.   Ingalls would still 'have a majority of the votes. Counsel for the defendants stated in the oral argument on the motion for a rehearing that the evidence does not show that

more than three of the bribe-takers were influenced thereby to vote for Ingalls, and that a great many of those who received bribes to vote for Ingalls in fact voted for Cimarron. But whether this is strictly true or not, whether many or few of the bribe-takers voted for Ingalls, there were not enough of them who voted for Ingalls to change the result. Let their votes all be stricken out, and Ingalls would still have a majority of the honest votes of the county. The friends of Cimarron also bribed many of the voters of the county to vote for Cimarron. As before stated, the question as to whether any voter received a bribe or not to vote for Ingalls is a matter wholly outside of the issues in this case.

We come now to the railroad question. It is in effect claimed by the plaintiff that the honest and regular returns made by the honest and faithful election officers of Montezuma township must be treated precisely like the false, fraudulent, and forged returns from Cimarron township; that if the returns from Cimarron township should be thrown out as not worthy of consideration, so should the returns from Montezuma township be so thrown out. It is unnecessary to say that this is not the law; that election returns from honest election officers cannot be so treated; and that the election returns from Montezuma township prove *prima facie* just what they purport to prove, and that every vote shown by such returns must be counted unless it is shown by evidence *aliunde* and paramount that such vote was illegal or fraudulent. And this remark with reference to the returns from Montezuma township applies with equal force to the returns from Hess township, and also to the returns from Ingalls and Logan townships; but not to the returns from Cimarron and Foote townships, where the election officers themselves so flagrantly and fraudulently conducted the election. But to return to the railroad question: It appears that Soule owns a large interest in Ingalls; also in the First National Bank at Dodge City; also in much other property at Dodge City; also in the Dodge City, Montezuma & Trinidad Railroad Company; and also in much other property in western Kansas. It is shown that

Soule stated that if the people along the line of the contemplated railroad would vote for Ingalls for the county seat, he would build or cause to be built that portion of the railroad which is located from Dodge City to Montezuma. It is not claimed that he offered to give the railroad, or any part thereof, or any stock therein, to any person or corporation, public or private, or that he would carry either freight or passengers free of charge, or that he would carry them for less than a fair compensation, or that he would issue or cause to be issued any free passes. The voters were not to get anything personal to themselves for anything they did or might do. The promise was simply that the railroad should be built through or into their neighborhood, but owned and operated by a private corporation. It is also said that this promise of Soule's influenced the voters of Montezuma and Hess townships to vote for Ingalls. It may be that except for this promise Montezuma, with its surrounding country, would have voted for its old rival Cimarron, for the county seat, but it is not likely that such would have been the case. It would probably have mainly voted for Ingalls as it did. There is but little direct or competent evidence tending to show that any particular voters were influenced by this promise. The evidence principally or largely relied on by the plaintiff with respect to this matter, and copied substantially in one of the plaintiff's briefs, is the following, which we quote literally from the record: John H. Kelly says: "I think it [the railroad matter] had a big influence in 28-30 and in 29-30, especially in 28-30. The railroad scheme, in my estimation, transferred in 28-30 from one-half to three-fourths of their votes." John A. Headley says, in answer to a question with reference to the supposed influence of the promise in Montezuma township: "I suppose about 75 per cent." And in answer to a question with reference to Hess township, says: "Well, I would not know what I would say; about 60, I expect, in Hess township." G. L. Ensign says: "If I should answer that to the best of my judgment, would be to say that that arrangement directly and indirectly gave Ingalls from 70 to 85 per cent. of the

votes that she got in that country." S. S. Van Wye says, in answer to questions: "I suppose I would be safe in saying 50 or 60; 50, well, I think I would be safe in saying 50 per cent., to the best of my judgment." The word "solid" was put into a question by counsel, and not in any answer of the witness. Will any lawyer consider this evidence as competent? Are these witnesses experts? Have they any special knowledge or means of knowing the secret springs of human action? Do they specially know upon what particular influences human volitions are necessarily founded? Have they some special and peculiar means of reading the human heart, and of solving its inscrutable and perplexing riddles? Can they look into the innermost consciousness of other beings and tell what is passing there, and testify to the same as experts? Can they view the conflicting passions, emotions, thoughts and feelings of any individual, his loves and hates, his likes and dislikes, the things which attract and repel him, and discover which for the time being is in the ascendency or has the mastery, and determine which shall finally govern. or control his actions? And may these supposed experts testify, not with regard to *each individual* separately, but with regard to *all the voters in the lump,* and with regard to all the influences, or the master influences, as they are supposed to operate upon all the individuals collectively and in the lump, and say that 50 per cent. or some other per cent. of the voters were influenced to vote in a particular way? All this evidence is of course illegal. But if a party may win his case by proving matters wholly outside of the issues in the case, (and this matter concerning the railroad and Soule's promise is wholly outside of the issues,) then of course he may with equal propriety win his case by the introduction of illegal and incompetent testimony. But let this evidence have its fullest weight. Say that because Soule promised to build a railroad to Montezuma every voter in Montezuma and Hess townships who voted for Ingalls was influenced thereby to so vote, and could not, in the nature of things, have so voted for any other reason, and strike out all their votes, and still Ingalls would

9—42 KAS.

have a majority of all the honest votes of Gray county.   But on the rehearing, and for the first time by a party, it is said that the honest vote of Gray county must also be thrown out. Now, must the rules of pleading and of evidence be ignored, not for the purposes of justice or of punishing the guilty, but to aid and foster injustice, and to disfranchise the innocent and honest voters?   Mr. Greenleaf says of the rules of evidence: "The *first* of these is, that the evidence must correspond with the *allegations*, and be confined to the point in issue." (1 Greenl. Ev., § 50.)   Now, is this first rule of evidence to count for nothing in the supreme court of Kansas?   In the four townships controlled by the friends of Ingalls great caution was exercised in the choice of election officers, and by the officers themselves, to see that a fair and honest election should be held, and no wrong further than we have already stated is shown as to any of them, and but little wrong is shown as having been perpetrated by the friends of Ingalls in at least two of them.   And are the people of these two townships, as well as all the good people of all the remainder of the county to be disfranchised?   And is all this to be done because of matters left wholly outside of the issues in the case, and where the evidence supposed to show the same is largely illegal and incompetent, and where the question of such disfranchisement was not raised by a party until on a motion for a rehearing?   As to the time for raising a question of this kind, or for raising questions generally in the supreme court, see the case of *The State v. Coulter*, 40 Kas. 673; 20 Pac. Rep. 525.   But it makes no difference in this case that the question of the invalidity of the election was not raised by a party until on the motion for a rehearing.   Even if it had been raised at the beginning and by the pleadings, still the decision would have to be the same, and in favor of the defendants; for under the facts of this case the election was valid, and a majority of the votes, and of the honest and legal votes, of the county was in favor of Ingalls.

We have not in this opinion gone extensively into the details of the aforesaid county-seat election.   This was sufficiently

done by Commissioner SIMPSON; and certainly no claim can be reasonably made, considering the facts of the case, that he treated the side of the plaintiff unfairly, or the side of the defendants with any greater leniency than it deserved, or than he did the side of the plaintiff.

The foregoing opinion is principally a reply to the dissenting opinion of the Chief Justice, filed on the original decision of this case; although it also answers as a reply to the briefs and arguments of counsel for plaintiff on their motion for a rehearing.    But since the foregoing opinion was prepared, the Chief Justice has prepared another dissenting opinion, in which he quotes detached portions of the evidence, and makes statements concerning the evidence.    We have quoted but very little of the evidence in our opinion, for the reason, principally, that the evidence is very voluminous, being sufficient, if copied in full, to fill three or four or more volumes of the Kansas Reports.    Even that portion of the evidence which tends to sustain our views, with the necessary comments thereon, would probably, if placed in this opinion, swell the same to several volumes.    Also much of the evidence is conflicting and contradictory, and some of it is false; and to quote it in detached, isolated and selected fragments, or to quote only such portions of it as tend to prove only one side of the case, would be very unfair and misleading.    We have attempted to give, not detached fragments of the evidence, nor the evidence of only one side, but we have attempted to give what we think the whole of the evidence proves; and this we have done after carefully weighing it all — the contradictory and conflicting as well as all the other evidence; and we have attempted to harmonize the evidence as best we could.    The small amount of the evidence which we have quoted literally was quoted because of the following statement found in the previous dissenting opinion of the Chief Justice, to wit:

"If, however, it be said that the votes of Montezuma and Hess townships should be counted for Ingalls, and thereby permit a fair share of the votes of Gray county to decide the county seat, then I answer, the testimony shows that a very

large per cent. of the votes received by Ingalls in these townships were transferred to that town by the promise of the chief owner of Ingalls to build a railroad free of cost east and west through and across these townships. James H. Kelly testified that this railroad scheme transferred from one-half to three-fourths of the votes of those townships. John A. Headley testified that seventy-five per cent. of the voters of Montezuma township were transferred to Ingalls in consideration of those propositions, and about sixty per cent. in Hess township. G. L. Ensign testified that the arrangement for the building of the railroad gave Ingalls directly and indirectly seventy to eighty-five per cent. of all the votes it got in the country. S. S. Van Wye testified that he preferred Cimarron, but the prospect of getting a railroad influenced his vote for Ingalls. He further testified that he thought the prospect of getting a railroad without bonds was the influence which made the vote in Montezuma township almost solid for Ingalls."

Much more of the evidence relied on by the plaintiff is incompetent; and in the light of the other evidence much of it is wholly false. It may be that many persons in Montezuma and Hess townships were influenced by the railroad proposition to vote for Ingalls, but it is not so shown by any competent evidence. There was not competent evidence sufficient to prove that more than two or three persons were so influenced, and perhaps not that many. There are many reasons other than the railroad proposition why the people of Montezuma may have voted for Ingalls: as, the former rivalries and feuds existing between Montezuma and Cimarron concerning county lines, stage lines, county seat, etc.; and also the relative location of the different towns, roads, etc., may have had much to do with the matter. More than a month before the election, (which was on October 31, 1887,) and about September 22, 1887, the town of Montezuma was withdrawn as a candidate for the county seat.

The bond testified to by G. L. Ensign as having been given by Soule to build a railroad, was, as we understand, merely a bond to build a railroad; and there was nothing in it concerning Ingalls, or the county seat, or the election; nor were these things even mentioned therein. Now, must this promise of

Soule to build a railroad to Montezuma necessarily disfranchise all the legal and honest voters of Gray county? Must it necessarily disfranchise all the legal and honest voters of Ingalls and Logan townships, where hardly the slightest fraud could be imputed to any of the friends of Ingalls? Must it necessarily disfranchise all the legal and honest voters of even Montezuma or Hess township? Is it the law that when some man promises to build a railroad in a county, and asks the voters to vote for a certain place as the county seat, that the voters of that county are then and forever afterward, while such promise remains, barred and disqualified from removing their county seat to such place? But as we have before stated, this question is unimportant, so far as this case is concerned.

Nearly one thousand pages of the evidence were taken by the commissioner, Mr. F. E. Carringer, prior to September, 1888, and hence the parties must have known at that time that Ingalls was, upon any fair count, elected to be the county seat of Gray county; and hence the several efforts that were made from that time on to have the court order that the county officers should remove their offices from Ingalls to Cimarron before the court had any opportunity to see the evidence.

There are many statements in the dissenting opinion with reference to what took place and as to what was shown by the evidence, which we do not at all concur in or agree to. On the contrary, we think they are wrong. Everything said concerning "killers," or guns, or arms, so far as the same affect the election as against Ingalls, is wholly irrelevant to this controversy, for there is not the slightest room in this case for even a pretense that any person that desired to vote for Cimarron was prevented from so doing, or was in any manner or to any extent intimidated, "bulldozed," or molested. Besides, the returns from Cimarron township show that at least one hundred more votes were cast in that township than they had legal voters, and that all the votes there cast except forty-five, were cast for Cimarron. The only difficulties and embarrassments thrown in the way of voters exercising their rights at that election were such as were inaugurated and interposed by

the friends of Cimarron in the townships of Foote and Cimarron, to embarrass the friends of Ingalls.

Commissioner SIMPSON in his opinion stated that the returns from Cimarron township could not be considered at all: *first*, because of the great frauds of the friends of Cimarron and of the election officers; *second*, because of the frauds of the friends of Ingalls. This second reason he mentioned as an "additional reason." In other words, as both the friends of Cimarron and the friends of Ingalls and the election officers all committed great wrongs, the election returns cannot be considered at all, either in favor of Cimarron or in favor of Ingalls. Is there anything so very bad in this? Any other decision than the one we have made in this case would, we think, not be in the interest of justice or of fair elections, but would be directly the opposite.

If we should confine ourselves to only the facts proved within the issues of the case as made by the pleadings, then it must be conceded that beyond all doubt Ingalls was elected to be the county seat of Gray county; and certainly the defendants have never expressly waived their right to have the consideration of the case confined strictly within the issues made by the pleadings. In their first and principal brief and abstract, filed at the time of the submission of the case on April 2, 1889, and which seems to have been the first brief or abstract filed in the case by any party, they discuss nothing but the issues in the case; and in their other brief, filed later, they do but little more than to discuss the issues; and on the hearing of the motion for a rehearing they insisted upon their right to have the case considered only upon the issues presented by the pleadings, although they claimed that it could not make any difference in the final result even if everything in the case should be considered; and we think so too, and have considered everything. Now, passing over the question concerning the issues as a matter of no consequence, then upon the merits of the case, taking all the evidence—the three or four thousand pages, not mere fragments—and considering it all, conflicting, contradictory, truthful, and false—and har-

monizing all of it as best we could, it must cer-
<span style="float:left">Ingalls, surely<br>chosen to be<br>the county<br>seat of Gray<br>county.</span> tainly be held that Ingalls was surely elected to be
the county seat.   It received a majority of all the
votes actually cast, a majority of all the votes cast
by legal voters, and a majority of all the votes cast by honest
voters.   And this is really where we have placed the decision.
The motion for a rehearing in this case will be overruled.

JOHNSTON, J., concurring.

HORTON, C. J.: I cannot concur with the findings of fact
or the conclusions of law stated in the foregoing opinion.   As
I understand the testimony, great injustice is done to the honest
voters of Gray county if the judgment is permitted to stand.

I. This proceeding was brought in this court to determine
the permanent county seat of Gray county, and if I could
conscientiously say from the testimony that a majority of all
the voters of Gray county, not influenced by bribes, nor by
any other corrupt or illegal means, cast their ballots for Ingalls
on October 31, 1887, for the county seat, I would very will-
ingly agree to the judgment.   This has not been established
to my satisfaction.   It is stated in the opinion that at the
hearing of this cause before the commission, each side was
given five hours for oral argument.   The members of the
court did not have the opportunity or privilege to hear these
oral arguments.   After considering the arguments, the evidence
and the briefs, the commission made their report.   Among
other things stated in that report, it was said:

"This case can fairly be said to embody the sum of all
election villainy.   If there is any one particular crime con-
nected with the conduct and the result of an election that was
not committed in Gray county on the 31st day of October,
A. D. 1887, our research has been in vain, for we have failed
to find it."

That the commission with some hesitation reached a con-
clusion in favor of Ingalls, is shown by the following extract
from the report:

"We have waded through the scum, filth, and mercenary

degradation of this record, and find but little to commend in the action of *either party*.. We must conclude as a matter of legal inference, from want of attack more probably than from any other circumstance, that there were some honest votes cast at that election. There is nothing left for us to do but to endeavor to give expression to the declaration of an honest majority. We hope and trust that we have found it rightfully."

This is not the language of confidence or certainty.

II. Again, the commission concludes its report as follows:

"The prevailing practice in these county-seat contests is for each party to import into the county a crowd of men who have the reputation of being 'killers.' It may be in some cases they do not vote, but we suspect that generally they do. The evident purpose of such an importation is to intimidate voters, and to have on hand and ready for any emergency that may arise, a class of men who would not hesitate to commit any crime, or number of crimes, that would give success to the party that pays them. The importation of such men causes a very strong presumption that they are employed for purposes connected with these elections that all ordinary men would hesitate to perform. Their employment is a reflection on the courage and honesty of the community that suffers such an outrage to be perpetrated, and causes their own acts to be regarded with some degree of suspicion. Their presence in a county that is cursed with a county-seat contest is a constant menace to the lives of many quiet and innocent people. One of the best indications that people desire an honest and peaceable election is their refusal to employ a horde of these conscienceless scoundrels; while on the other hand, their presence at the polls irresistibly leads to the conclusion that they are hired for criminal purposes."

These general remarks of the commission can be very appropriately and fittingly applied to the conduct of the owners and friends of Ingalls. The opinion admits that —

"The principal persons engaged in bribing and influencing voters to vote for Ingalls were Asa T. Soule and his agents. Soule is a very wealthy man residing at Rochester, New York, and his agents who were engaged in this business are principally, if not entirely, non-residents of Gray county. The bribing on the part of Ingalls was nearly all done in Cimarron township, though some of it was done in some of the other townships."

Lee Grand Marshall testified that he lived in Foote township, Gray county; that he was a farmer; that he had resided there two years; that he was at the polls all day in Foote township on the 31st of October, 1887; that he was then acting as deputy sheriff; that the deputy sheriffs there were residents of the townships — peaceable, law-abiding citizens; that he did not hear any complaint from any of the Ingalls people that day that they were not receiving fair treatment, or that they were not being permitted to vote as freely as they wanted to, or anything of that kind; that there were some strangers there in the morning and there was another load came in the evening; that the strangers in the morning were Dave Goddard, from Garfield, and others, who came in the interest of Ingalls; that a load of men came there in the evening, just before dark; that some of them were pretty tough-looking men; that one was a low, heavy-set fellow, kind of a tough-looking chap; that one of them had a little piece out of one of his ears, a little bit taller than that one, and that a couple of other men smaller than they were; that there were no marks on them that he could describe; that he had heard the names of two of them — Ben Daniels and Ed. Prather; that the short, heavy-set fellow was Ed. Prather; "the one they told me was him, had a badge on." He further testified that these "outsiders" were there in the interest of Ingalls.

Edward M. Ratcliff testified —

"That on election day many non-residents appeared in Cimarron: Geo. Gilbert, Bob. Wright, Henry Wright, Eat-em-up-Jake, Ben. Daniels,ª Bat Masterson, Ed. Prather, Burns, Bill Tighlman, Fitzgerald, Conk. Jones, Baldy Scott, about sixteen in all."

"That all he saw were armed; that they stopped at the Merchants' Hotel; that their headquarters were in the parlors of the hotel; that Mr. Gilbert was with them; that he understood at the time that Gilbert was buying votes."

John G. Gilbert testified —

"That he was the financial manager of A. T. Soule; that although he was a non-resident of Gray county, he was in

Montezuma township on October 31, 1887—the day of the county-seat election."

He was asked "What he was doing in Montezuma township all that day?" He answered: "Went down there to see how the feeling of the people was." He also testified "That A. T. Soule was worth $8,000,000 or $10,000,000."

"Q. You know that Mr. Soule has been interested in this county-seat contest? A. Yes, sir.

"Q. Don't you know that he has been spending some money up there? A. I would suppose that he had."

Geo. G. Gilbert testified—

"That he resided in Speareville, Ford county; that prior to August 31, 1887, he handled some lands for A. T. Soule; that he was also superintendent of a canal company, and that Mr. Soule's money was used in the construction of the canal; that he was at Cimarron on October 31, 1887; that he drove there from Ingalls; that he arrived at Cimarron about nine o'clock A. M.; that he went to the Merchants' Hotel, and sat in the hotel most all the day; that this was about half a block from the polling-place; that he remained there until the next morning, when the train went east; that there were others at the hotel, among them Ben Daniels, Bat Masterson, Bob Wright, Henry Wright, Dave Morrow, Bill Tighlman, D. Gardner, Jack Flood, and John Sheridan."

He further testified:

"Q. Did anybody have any guns up there? A. Yes, sir.

"Q. Who had the guns there? Please name the men— state where they were situated with their guns. A. Why, there were several of the boys had their guns in what they call the 'parlor,' up there.

"Q. Who were they that had their guns there? A. I don't know as I know which ones had the guns; I could not tell; I know the boys went there, 15 or 20 of them, and took some guns there; they were sitting in the room.

"Q. As a matter of fact did not they all have guns there, these 15 or 20 men that you have spoken of? A. I suppose they did.

"Q. What kind of guns did these men have there in that parlor? A. There were some shot-guns there, and some rifles.

"Q. As a matter of fact, most all these men had side-arms: or did they not? Perhaps every one of them. A. I don't know; I did not see them; they might have had them in their pockets.

"Q. Did they have any ammunition there in any of these rooms? A. Yes, sir.

"Q. What room? A. In the parlor or sitting-room.

"Q. In the parlor where the guns were? A. Yes, sir.

"Q. When did you arrange with those boys to go up there —this 15 or 20 men that you speak of? A. I don't know as there was 15 or 20 of them; I guess there was hardly that many.

"Q. There were 16 men in all were there not? A. I don't remember; I did not have their names down.

"Q. When did you say you arranged with them to go there? A. I don't remember; just a few days before the election.

"Q. Who did you arrange with to become manager of the forces there? A. I talked with Mr. Masterson and Mr. Tighlman.

"Q. Bat Masterson and Bill Tighlman? A. Yes, sir.

"Q. Which one of those men was understood to be the manager of the thing? A. I guess both of them.

"Q. The other men were under them particularly? A. Yes, sir.

"Q. Under their direction? A. Yes, sir.

"Q. These men all have the reputation of being brave men, and sure shots, did they not? A. They had the reputation of being pretty brave fellows if it was necessary.

"Q. They were understood to be so throughout this entire country, were they not? A. I expect so.

"Q. And they were employed and taken there for that very reason — because they were so understood to be acquainted with the trigger, and brave men, and fighters if necessary? A. Yes, sir.

"Q. How much were you to pay these men for their work there? A. I agreed to pay some of them $25 for their day's work, and some of them $50."

The presence of the above-named non-residents, many of whom were "toughs" and "killers," in Gray county on the day of election, was a menace to the honest voters. These non-

residents were all employed in the interest of Ingalls. In the language of the commission:

"The importation of such men causes a very strong presumption that they were employed for purposes connected with the election that all ordinary men would hesitate to perform."

I cannot find from the testimony that the friends of Cimarron imported to Gray county, to participate in the county-seat election of October 31st, such a crowd of "killers" and "roughs" as is shown to have been brought in by Gilbert — the agent of A. T. Soule; but if it were true that the friends of Cimarron were equally guilty in that respect, then an election so menaced cannot be regarded as fair or honest, and therefore ought not to stand. It ought not to stand, if for no other reason, because of the moral effect that it will have upon future elections in the state.

III. The report, after stating that the friends of Ingalls kept in Cimarron on election day "an open market-house, hedged about and protected by a gang of reputed cut-throats and villains, where men's votes were bought and sold as so many steers in the pasture, or sheep in the pen," concludes that this affords another and very important reason why the returns from this township should not be considered. In other words, one of the reasons for rejecting the returns from Cimarron, and thus making Ingalls the county seat, is that the friends of Ingalls were guilty of great wrongs and crimes in Cimarron on the day of election, and therefore they are to be greatly benefited thereby. To me this seems unfair, and not in accordance with common justice. I never supposed that in a court the frauds and crimes of a party could be established as the foundation of any legal rights.

IV. In the opinion the title of this action is given, and the names of the parties. It is further stated that "the attorney general has taken no part in the action, except merely to permit his name to be used." The opinion, however, wholly

omits to state that A. T. Soule, of New York, paid the attorneys who appeared in this action for the defendants, and is the person who furnished the money for the fees of F. E. Carringer, the commissioner, and also the fees of the witnesses who were called for the defendants.   John W. Gilbert, the financial manager of A. T. Soule, gave the following testimony:

"Q. Can you state who employed the attorneys in this present suit for the defendants?   A. I think the attorneys are all employed by Mr. Soule by the year, to attend to all and any of his business that he may have occasion to attend to.

"Q. Who employs Mr. Whitelaw in this suit?   A. Mr. Soule, I think.

"Q. Who employs Mr. Dunn?   A. I think Mr. Soule.

"Q. Who employs Mr. Frush?   A. Soule, I think.

"Q. Who employs Mr. Jennings?   A. Soule, I think.

"Q. Who employs Mr. Sterry?   A. Soule, I think.

"Q. Can you state whether or not Mr. Soule put up money in payment of witnesses in behalf of defendants in this proceeding?   A. I don't know.

"Q. Never heard him say so?   A. No, sir.

"Q. Who put the money up?   A. I have been paying the commissioner.

"Q. I thought you said you had nothing to do with it?   A. I understood that that was the county campaign business.

"Q. Whose money is that that you pay to the commissioner?   A. Mr. Soule's money.

"Q. Have you paid any of the witnesses?   A. I suppose they have been paid out of that money.

"Q. Where did you put the money?   A. Put the money to the credit of Mr. Guynn, at Ingalls.

"Q. How much did you put up?   A. I don't remember.

"Q. In the neighborhood?   A. I think for the commissioner and expenses of the marshal something like four or five hundred dollars.

"Q. How much for the witnesses?   A. That is all together.

"Q. That is all A. T. Soule's money?   A. Yes, sir."

He also further testified:

"Q. Did you ever, during the year 1887, give Mr. Dunn any money?   A. I think I did.

"Q. How much?   A. I don't remember.

"Q. And what for was it given? A. I might have given him something like $1,100.

"Q. For what? A. Services as lawyer."

This is further testimony that "outsiders" and "non-residents" of Gray county are attempting to locate the county seat of that county and control its local affairs. If neither the defendants in this action nor the voters of Gray county are sufficiently interested to pay the attorneys for defending this action, or furnish money for the fees of the commissioner, or witnesses, it looks very much as if neither the defendants nor the voters of Gray county were very much interested in the case as against the claims of the plaintiff.

V. Several pages of the report are taken up with statements concerning the rejection by the Cimarron people of a proposition made by alleged representatives of Ingalls, preceding the election, to permit persons favorable to Ingalls to be present at the election and count, in all the precincts known to be favorable to Cimarron for county seat. To fully understand this matter, additional facts appearing in the testimony ought to be stated. The first inquiry naturally is, who were these representatives of Ingalls? The testimony fully discloses. John W. Gilbert, the financial manager of A. T. Soule, testified that the proposition referred to in the report was made by himself, in company with his brother, George G. Gilbert, R. M. Wright, and Bat Masterson. All of these persons were and are "non-residents" of Gray county, and had no more right or authority to interfere in an election of Gray county than any citizen of Shawnee or Leavenworth county. The people of Cimarron might very properly have refused to hold any communication or consultation with these "non-residents" about the county-seat election, and ought to have resented such unwarranted interference from "outsiders." This committee of "non-residents" also submitted a written proposition to certain residents of Cimarron concerning the conduct of the county-seat election, and this writing was signed by John W. Gilbert, R. M. Wright, G. G. Gilbert, A. T. Soule, and his attorney, Geo. W. Dunn. Every person who signed this

writing was a "non-resident" of the county, excepting Geo. W. Dunn, who was the attorney of A. T. Soule, but he resided in Cimarron, not in Ingalls. The conclusion of this writing read as follows:

"Any delay or postponement beyond Saturday night next, upon any pretext, for the purpose of consultation, or otherwise, we shall regard as a refusal, and govern ourselves accordingly."

Not only was this proposition presented by "non-residents" of Gray county, but it contained a threat, which constituted a gross insult to the people of Cimarron. If I understand the testimony in the record correctly, the only resident of Gray county who made any request of the people of Cimarron to have representatives of Ingalls witness the election proceedings in the precincts favorable to Cimarron, or who requested any Ingalls partisan to be admitted in the voting-room at Cimarron where the election was being conducted, was George W. Dunn, of Cimarron. Mr. Dunn at the time of the election was a resident of Cimarron, but had been employed to work against his own town in the interest of Ingalls. Concerning Mr. Dunn's conduct a few days prior to the election, C. J. Dixon testified:

"I went over to my brother's house — I think it was on Monday evening, the day before the election — and as I was leaving his porch Mr. Dunn spoke to me from his porch, and said he would like to speak to me, and I went over and spoke to him, and had a little talk with him, and he asked me if I knew who was going to be the board, [election board at Cimarron,] and I told him 'no;' and I related to him this remark that had been made to me in substance, and he said, 'You think you will be on the board?' and I says, 'I don't know;' I just related what I heard; and he says, 'If you go on the board and represent Ingalls, you and I can make a heap of money out of it.' I said, 'Is that so?' He said 'Yes.' He says, 'I will give you some money if you will give me half of it, and go on the board as an Ingalls man.' He says, 'Of course we would not want the people here to understand that you represented Ingalls, but if you get your money we will expect you to do all you can to aid and abet Ingalls.' He

said a whole lot of truck.   There was one idea of the whole business—that he could get me $1,500 if I would give him $750."

There was other testimony given of similar import.  · It is but just to Mr. Dunn to say that he denies these statements, and that upon this matter there is a conflict of testimony.

VI. The action of the "Equalization Society," which was formed to sell the votes of its members for the location of the county seat, is properly condemned and denounced in the report.   The report, however, omits to state that A. T. Soule a few days before the election visited the "Equalization Society" when it had a meeting in a "dug-out," and had a talk with its members.   Of some of the proceedings at that meeting Silas Ballah testified as follows:

"Q. Mr. Soule was once there at the society?   A. Yes, sir, he was there one day.

"Q. Did he make a statement that he would donate more to the society than any other man?   A. I do not think he did it that way.

"Q. How did he do it that day?   A. He said he would do better.

"Q. What did you understand by that?   A. I supposed he would give more."

Of this meeting Lee Grand Marshall testified that—

"Mr. Chipman, the chairman of the meeting, introduced him to the society as Mr. Soule, from Rochester, N. Y., and he made a bow, like.

"Q. Well, he told an anecdote: now go on and state what else he said, if anything.   A. Why, the chairman asked him 'if he had anything to say to the society,' and he said 'he did not know;' says he, 'What do you want?'   Chipman says, 'Most anything, I guess,' is the way he said, 'to help us on our claims in the way of donations; we are open and ready for donations.'

"Q. What reply was made, if any?   A. Chipman remarked that 'We want something to help us to stay on our claims,' and when he made that remark, Soule says, 'How will a sugar factory suit you fellows out here?'   Henry Kopp spoke up and says, 'A sugar factory would not help us much this winter; we want to start a grange store;' and then Mr.

Soule remarked again that 'He thought a sugar factory would be a good thing for this country out here; that they could not raise much else;' and Harry says, 'That would not do us any good this winter;' and Mr. Soule says, 'You want refined sugar, then;' Kopp says, 'We want refined sugar, that is what we want;' and Mr. Soule said then, 'If I give you refined sugar, as you call it, how will I know whether I get a solid vote of the society, or not?' Mr. Chipman, the chairman, spoke up and said, 'You won't know that; every man of the society has a right to vote for their own interest. We are not selling our votes. If you have anything to donate to the society, you can do so.' Then Mr. Soule says, 'Now what will I get then for the donation of the sugar?' I can't just tell the words that was used; 'if he would donate anything, what would he get for it;' and Harry Kopp spoke up and says, 'You will get the good-will of the society, if nothing else.'

"Q. What did you understand that he meant, and what did the society generally seem to understand that he meant by wanting to know whether he would have the solid vote of the society, or not? Solid vote for what? A. Well, when he said, 'How will I know whether I get a solid vote of the society?' after Chipman spoke, Charles Dunlap was there, and he got up and says: 'Mr. Soule, if you come out here to buy votes, you are off; you cannot buy one vote of this society for a thousand dollars;' the old man kind of dropped his head, and seemed sold.

"Q. What did he say he would do before he left, if anything, for that society? A. After he found out the sugar factory did not take very well, Mr. Chipman, the chairman of the society, said, 'Mr. Soule, are you going to do anything for this society?' He says, 'I am going to do the best;' and Chipman asked him the same question I guess about three times, and he answered the same way every time, 'that he was going to do the best.'"

In this connection, to show the systematic and wholesale corruption which permeated Gray county prior to and at the county-seat election, I cite from the record, which is full of like instances, the following testimony of the conduct of A. T. Soule in his attempts to control illegally the result of that election. E. E. Bowlus testified:

"That he voted for Ingalls; that Smith Payne came to him

and said, 'I want you to buy votes,' and gave him some money."

Smith Payne testified:

"Q. From whom did you get the money that you paid Bowlus? A. I did not get any money; I got a check.

"Q. Did you get a check through the mail? A. I got it personally.

"Q. From whom? A. A. T. Soule.

"Q. Directly? A. Yes, sir.

"Q. Through the intervention of no other hand? A. No, sir.

"Q. Where was he when he handed you the check? A. He was in the hotel.

"Q. On what day did he hand you the check? A. It was on Saturday, before that first election.

"Q. Before the October election? A. Yes, sir.

"Q. When did the October election occur? A. On the 31st of October.

"Q. What did you do with the check? A. I gave it to Mr. Bowlus.

"Q. What was the check for — how much? A. $500.

"Q. When did you give Bowlus this check for $500? A. Gave it to him on Saturday evening.

"Q. Where were you when you gave Bowlus this check? A. I was at Pierceville, I think.

"Q. Was Bowlus there? A. Yes, sir.

"Q. Did Bowlus get the check cashed at Pierceville, or not? A. I guess he did.

"Q. How much of that money did he give you back? A. Not a dollar.

"Q. Did you give any instruction to Bowlus? A. Yes, sir.

"Q. What was it? A. Just Mr. Soule's word.

"Q. What was it? A. Mr. Soule said 'to take that money and pay to men to vote for their principles; what they wanted to vote for.'

"Q. Pay them for honesty? A. Yes, sir."

W. F. Thompson testified that he lived in Hess township; that he supported and voted for Ingalls. He further answered as follows:

"Q. Did you ever at any time have any business transac-

tion with Mr. Soule? Did you ever pay any money? A. Yes, sir.

"Q. When? A. I cannot give the date.

"Q. About when — before or after this election? A. Before, I think it was.

"Q. How much did he pay you? A. $1,000.

"Q. For what? A. Well, expenses and speakers.

"Q. He gave it to you to expend at that election? A. Yes.

"Q. Who handed you that money? A. Cashier, I believe, at Dodge City.

"Q. Was it one of the Gilberts? A. No, sir.

"Q. Give it to you currency? A. Yes, sir.

"Q. Took it home with you in small bills? A. Yes, sir."

John Craycraft testified that he supported Montezuma for the temporary county seat of Gray county, and Ingalls for the permanent county seat.

"Q. You may state what conversation you had, if any, prior to the day of the election, with A. T. Soule, in relation to the expenditure of money in Cimarron on that day. State the full conversation. · A. He asked me how much it would take to buy 200 or 230 votes.

"Q. What did you tell him? A. Take about $25 apiece to buy them.

"Q. What else, if anything, did he say? A. He wanted to know if that wasn't a little steep.

"Q. State what was your reply and his to you. A. I told him it would take about $25 apiece on the average to buy them.

"Q. Where did you have this conversation with Mr. Soule? A. In Ingalls.

"Q. On what day? A. Saturday before the election.

"Q. Saturday before the 31st day of October, 1887, election? A. Yes, sir.

"Q. Now, state what else he said there in relation to this matter, if anything — in relation to the expenditure of money that day. A. He got a little scared at Cap. Shaw, a traitor.

"Q. What did he say about Cap. Shaw, if anything? A. He said he was afraid Cap. had gone back on him.

"Q. In the county-seat fight? A. Yes, sir.

"Q. Go on and relate the conversation. A. He said, 'Great God! if any man can tell how much money it will take, I will freely put it up; but I don't want to be beat with my own money.'

"Q. What township was he to buy? A. In Hess.

"Q. And Mr. Soule stated to you in substance, 'My God! if I knew how much it would take to buy the county seat, I would freely spend it'? A. 'My God! if any man can tell how much it will take, I will freely put it up; I am afraid I will get too much money out, and get beat with my own money.'"

A. T. Soule did not testify in this case, and the foregoing testimony is uncontradicted.

VII. All of the statements and arguments of the opinion attempt to establish mainly the following propositions:

First, that as the alternative writ does not allege any fraud or illegality or irregularity in the county-seat election, or in any one or more of the election precincts, and as the return thereto alleges frauds, illegalities and irregularities only in Cimarron, Foote, and Logan townships, the testimony that the voters in Hess, Montezuma, and other townships were controlled by A. T. Soule and the friends of Ingalls by bribes or other corrupt or illegal means to cast their ballots for Ingalls is incompetent, and should be wholly disregarded.

Second, that Ingalls at the late county-seat election "received a majority of all the votes actually cast, a majority of all the votes cast by legal voters, and a majority of all the votes cast by honest voters," and is therefore the permanent county seat of Gray county.

Of these propositions in their order.

VIII. The objection to a full investigation of the frauds, corruption and violence in Gray county on October 31, 1887, and against deciding that "there was no valid election held in that county at that time," is more fully stated in the opinion in the following language:

"The only questions presented by the pleadings, as will be seen from an inspection thereof, are as follows: Were there any such frauds, illegalities and irregularities in Cimarron, Foote and Logan townships as are alleged and set forth in and by the defendants' answer to the alternative writ?"

This statement is technically correct, but considering the

character of this proceeding, the testimony taken by the commissioner of this court, the briefs and abstracts filed upon the first trial of hearing, the statement is not, in my opinion, sufficiently full as to the actual issues presented, heard, and decided.    F. E. Carringer was appointed by the court on July 6, 1888, as the commissioner to take the testimony in this case.    By the various orders of this court and the consent of the parties, the testimony was not closed until February 25, 1889.    Mr. Carringer's report was filed in this court April 1, 1889.    The report embraces a mass of testimony establishing, in my opinion, that voters of Hess, Montezuma, and other townships of Gray county, were illegally controlled by bribes and other corrupt and illegal means to cast their ballots for Ingalls.    This testimony was taken in the presence of all the parties or their attorneys, and before this case was submitted the attorneys fully understood what the record contained. The opinion, in referring to the claim "for error of law occuring at the trial," states, "The second ground for a rehearing is inapplicable, for the reason that nothing was excepted to during the trial."    If it be true that nothing was excepted to during the trial, then all the testimony in the record is before the court for consideration without objection.    In the first brief filed by the plaintiff, the claim was made that—

"The evidence of bribery and corruption on the part of A. T. Soule and his agents, the backers and boomers of Ingalls, presents a most revolting spectacle to the minds of decent, honest people; that the corruption fund was so large, and the money so free, we would not be surprised if the court should be in doubt whether Ingalls received a single honest, unpurchased vote; that it is shown in the two south townships of the county, Hess and Montezuma, that there was a general understanding that if the voters of that territory would vote for Ingalls for the county seat, withdrawing Montezuma as candidate from the race, A. T. Soule, chief backer of Ingalls, would build a railroad, free of cost, east and west through those townships; and that a large proportion of the voters in those townships were induced to vote for Ingalls by reason of the proposition of Mr. Soule to build the road; that if these voters had been left to themselves, and had not been directly

bribed by a pecuniary advantage and consideration to them-
selves, *i. e.*, the building of this road, and the employment of
them in its construction, Cimarron would have received fully
three hundred more votes than it did."

In the abstract of the plaintiff, filed before the trial, about
13 pages were devoted to testimony tending to prove the
bribery and corruption of A. T. Soule and his agents in the
county-seat election.    Ten pages of that brief were also de-
voted to testimony tending to show an agreement between A.
T. Soule and the voters of Hess and Montezuma townships,
by which Montezuma was withdrawn as a candidate for the
county seat, and the votes of those townships cast for Ingalls,
upon the consideration from Soule as above stated.    To these
claims of the plaintiff, there is nothing in any of the briefs or
abstracts of the defendants filed before the rendition of the
judgment, which suggests that the testimony concerning the
bribes and other corrupt and illegal means employed by A.
T. Soule and his agents should not be considered, or that it
was incompetent.    In examining the testimony and the briefs
originally filed, I find no objection presented against a full
investigation of all the frauds, irregularities and corruption
established.    In the original briefs and abstracts, no point was
made that the examination of the court as to frauds, illegali-
ties and irregularities must be confined to Cimarron, Foote
and Logan townships.    This is an original proceeding in this
court.    The only pleadings allowed are the writ and the return
or answer.    "These are the pleadings in the case, and have the
same effect, and are to be construed, and may be amended in
the same manner, as pleadings in a civil action; and the issues
thereby joined must be tried, and the further proceedings
thereon had, in the same manner as in a civil action."    (Civil
Code, § 696.)    It has been decided time and again in this
court, that—

"Where the record fails to contain any reply to an answer
alleging new matter, but the case was tried by both parties
without any objections on the account of the want of a reply,
this court will treat the case in the same way." (*Bent v. Phil-*

*brick,* 16 Kas. 190; *Wilson v. Fuller,* 9 id. 177; *Netcott v. Porter,* 19 id. 131; *Nooner v. Short,* 20 id. 524.)

As the only pleadings in a case of this kind are the writ and answer, the court may at any time before or after judgment, in furtherance of justice, amend the writ by inserting other allegations material to the case, or conform the writ and answer to the facts proved. (Code, § 139.)  This case, up to the time of judgment, had been tried in every respect as if the writ had been amended so as to conform to the facts proved, and therefore the defendants waived all objections to the court fully considering every fact in the testimony applicable to the county-seat election of Gray county.  The questions presented by the pleadings have, in my opinion, been so widened and broadened by all the parties as to include the frauds, illegalities and irregularities established by the testimony in the late county-seat election in every township of Gray county.  Of course this includes Hess and Montezuma, as well as all the other townships.

In *The State v. Stock,* 38 Kas. 158–190, the point was made by the defendants that the evidence impeaching votes cast for La Crosse was incompetent, because not within the pleadings or issues.  It was said in the opinion filed upon the rehearing, that —

"This case does not come here by appeal or on error.  Being an original action, the pleadings may at any time in the furtherance of justice be amended.  Therefore, if under the pleadings the evidence of the illegal votes cast for La Crosse was inadmissible, the pleadings, upon the facts disclosed in the testimony, might be considered as amended.  We think, therefore, as stated in the original opinion, that 'all evidence tending to show fraudulent practices by illegal votes cast for and legal votes rejected for both places was admissible.'"

This, and other authorities of a like kind which might be cited, fully and clearly dispose of, I think, the point that the court, under the pleadings and record, can only investigate the frauds, illegalities and irregularities in Cimarron, Foote and Logan townships.  But I go further than this.  If it is established by the testimony — and I think it is — that the

election in Gray county on October 31, 1887, was "rotten from rind to core," and that it would be a gross fraud and injustice to the people of that county to settle permanently the county seat upon such an impure election, then it is the duty of the court on its own motion in furtherance of justice to conform the pleadings to the facts proved, and declare the so-called election void and of no effect. In proceedings of this kind the discretion of the court is very great. If possible, the court in this case "ought to investigate to the very foundation, and examine to the utmost extent, every question of law and of fact, and every circumstance connected with the case, so as to do justice to the innocent and deserving." (*The State v. Marston*, 6 Kas. 524.)

IX. It is said in the opinion that, "Upon the oral argument on the hearing of the motion for a rehearing, and for the first time by any party to the action, it was claimed that there was no valid election held in Gray county on October 31, 1887." This, however, ought not to bar the plaintiff from having the court fully consider the claim. No oral argument was presented in this case to the court until the application for a rehearing was heard. This was an original proceeding in this court, and in such a case oral argument cannot be denied to either party before judgment. In a case like this, the court is a trier of facts as well as of law. (*Douglass v. Hill*, 29 Kas. 527; *C. K. & W. Rld. Co. v. Town-Site Co.*, ante, pp. 97, 104; 21 Pac. Rep. 1112–1120.)

I do not think *The State v. Coulter*, 40 Kas. 673, applies. That was an appeal by the defendant from a conviction in a criminal case. This court had no power in that case to permit the information or pleadings to be amended. This case does not come here by appeal or on error. Being an original action, the pleadings may at any time, in the furtherance of justice, be amended.

X. I come now to consider the statement "that Ingalls received a majority of all the votes cast by the honest and legal voters, and therefore is entitled to the county seat."

This brings up for consideration the question whether there was any valid election held in Gray county at the time of the holding of the county-seat election on October 31, 1887. It is admitted in that opinion that "it is shown that Soule stated, if the people along the line of the contemplated railroad would vote for Ingalls for the county seat, he would build, or cause to be built, that portion of the railroad which is located from Dodge City to Montezuma." I think the testimony in the record clearly establishes that a few weeks prior to the election Montezuma was withdrawn as a contesting town for the county seat, by the agreement between A. T. Soule and the voters of Montezuma and Hess townships, whereby Soule was to build a railroad through Hess and Montezuma townships, and in return the voters in those townships were to vote for Ingalls as the county seat. Did not this withdrawal of Montezuma as a contesting town for the county seat go to the validity of the county-seat election?

In January, 1871, the legislature of this state attempted to elect Mr. A. Caldwell a United States senator. The whole number of votes cast at that election for senator by the members of the legislature was 123; 62 votes were necessary for a choice. Mr. Caldwell received 87 votes. The candidates opposing, 36. The United States senate investigated this election in 1872–3. It was ascertained in the investigation, among other things, that Mr. Caldwell, just prior to his election, paid Mr. Carney, who was not a member of the legislature, but was a contesting candidate for the United States senate, $15,000 in consideration that he should not be a candidate for senator before the legislature, and should give his influence and support for Mr. Caldwell. Thereon a majority of the committee on privileges and elections of the United States senate, through the able and distinguished senator from Indiana, Mr. Morton, presented a report to the senate that this matter went to the validity of Mr. Caldwell's election, and had the effect to make it void. On February 17, 1873, Mr. Morton, under instructions from the committee on privileges and elections, presented the following resolution: "*Resolved,*

That Alexander Caldwell was not duly and legally elected to a seat in the senate of the United States by the legislature of the state of Kansas." (Senate Rep., 3d Sess. 42d Cong., No. 451, pp. 1–4.) Soon after this resolution was presented, Mr. Caldwell resigned as senator. The vacancy was filled by the appointment of Hon. Robert Crozier, the present district judge of Leavenworth. If the rule adopted by the committee on privileges and elections of the United States senate in the Caldwell case be applied to the election of October 31, 1887, in Gray county, then the withdrawal of Montezuma as a contesting candidate for the county seat under the agreement with Mr. Soule had the effect to make the election null and void. Mr. Caldwell undoubtedly argued to the United States senate that "he received a majority of all the votes actually cast, a majority of all the votes cast by the legal voters, and a majority of all the votes cast by all the honest voters," and therefore that he ought to be permitted to occupy his seat in the United States senate. The complete and legal answer by the committee to all of this was, "Your agreement with Mr. Carney made your election void." The report of the committee of the United States senate in the Caldwell case concludes that "Caldwell was as much sinned against as sinning." It cannot be said in this case that A. T. Soule and the friends of Ingalls "were as much sinned against as sinning."

Further, in the agreement with Carney, Caldwell dealt with a person who was not a member of the legislature, and therefore had no vote. A. T. Soule dealt directly with the citizens of Hess and Montezuma townships, and the committee appointed by them. They were not only voters, but cast their votes in accordance with the agreement. If Montezuma had been dropped as a contesting town without any agreement with Soule, or if it had been withdrawn because of the public interest of the whole county, or because Ingalls was more centrally located, or because the voters of Hess and Montezuma really preferred Ingalls as the county seat, a wholly different question would be presented than the one raised by the testimony and briefs.

XI. Even, however, if the rule in the Caldwell case is not applicable to an election relating to a county seat, I think that there is sufficient testimony in the record to put the town claiming anything under the election in Hess and Montezuma townships to the proof of its votes by evidence other than the returns. There is copied in the opinion from one of the plaintiff's briefs the statement of several witnesses that in their opinions the railroad scheme of Soule's transferred a large per cent. of the votes from Cimarron to Ingalls, some of the witnesses estimating the per cent. as high as 85. This testimony is held to be incompetent. Of course this is so, and this testimony ought not to be considered. The mere opinions of witnesses upon such matters as this are not testimony of any weight. In preparing my dissent to the judgment I referred to the testimony of three witnesses who gave their opinions as to the number of votes transferred to Ingalls by the railroad scheme, but I did this because like opinion testimony was introduced by the defendants to show that the members of the "Equalization Society" were influenced to vote for Cimarron on account of the $10,000 bond. In the one case as in the other, the opinion testimony should be wholly excluded.

While the briefs of the plaintiff refer to opinion testimony, they also refer in the same connection to the testimony of such witnesses as S. S. Van Wye, who testified that "he first supported Montezuma, but the prospect of getting a railroad influenced his vote for Ingalls;" to John Craycraft, who testified "that he was for Montezuma for the temporary county seat, but he voted for Ingalls to get a railroad, and that this was the inducement;" and to very much such testimony as this:

"Q. Mr. Craycraft, you may state whether you were present at a mass meeting of the citizens of south Gray county at Montezuma sometime prior to the October election, 1887? A. I was.

"Q. At which meeting Mr. A. T. Soule made an address, or talked some in relation to building a railroad through south Gray county? A. I was at two or three meetings when he addressed the people.

"Q. Were you at the mass meeting there at the time that the first proposition was made public by Mr. Soule to build a railroad through south of Gray county, in which resolutions were passed pledging to support Ingalls for permanent county seat? A. I was present.

"Q. You were present at that meeting? A. Yes, sir.

"Q. About how many people were present at that meeting, as near as you can remember? A. 250 or 300.

"Q. You may state the substance of Mr. Soule's remarks, if he made any there that day. What did he talk about? A. He made the remark 'That if Montezuma would withdraw from the field as a candidate for county seat in favor of Ingalls, he would build them a railroad.'

"Q. On what conditions did Mr. Soule propose to build that road, aside from the consideration that the people of that county were to vote for Ingalls for county seat? A. I believe that was all the conditions.

"Q. Do I understand you to say that the proposition to the people there *en masse* made by Mr. Soule was 'that if they would support Ingalls for permanent county seat, that he would build the railroad through south Gray county'? A. Yes, sir.

"Q. You may state the substance of the motion or resolution that was carried by the vote of that meeting. A. The motion was made 'that if the people would withdraw Montezuma from the contest in favor of Ingalls, the railroad would be built.'"

XII. The briefs of plaintiff also refer to the resolutions of various public meetings held in Hess and Montezuma townships prior to the election, to consider the propositions of Soule, and also the resolutions adopted at these meetings to vote for Ingalls on account of the agreement of Soule. The briefs also refer to the testimony of G. L. Ensign, who was interested in Hess township, and who testified about Mr. Soule executing a bond in the sum of $75,000. In the contest for temporary county seat Montezuma had 560 votes, Cimarron 705, and Ingalls only 88. One of the witnesses testified that in the vote for temporary county seat some of the voters of Montezuma voted for Cimarron, but none for Ingalls. I think it is clearly manifest from the testimony that but for the bribery and corrupt schemes of A. T. Soule, the principal contesting towns for county seat in Gray county would have been

Cimarron and Montezuma. This much is certain, that Montezuma was a candidate for the permanent county seat up to a few weeks prior to the election, and to the time that the railroad scheme of A. T. Soule was proposed and accepted, and his bond for $75,000 given.

XIII. Where an election is conducted regularly and legally so far as the officers are concerned, the returns are *prima facie* evidence of what they purport to show. In Logan township 22 votes in favor of Cimarron are not counted, because procured "by fraud, bribery, and corruption." The report says: "That the members of this society [Equalization] voted for the town of Cimarron, influenced and controlled by the promise of money, we entertain no doubt; but when we come to determine the exact number of votes and the names of the voters, the proof is not so satisfactory." All of the members of the "Equalization Society" in Logan township are rejected, not because it was shown by the testimony of each voter that his vote was influenced by the promise of money from Cimarron, but because the conduct of the officers and leading members of that society, the execution of the bond of $10,000, the result of the election in Foote and Logan townships, and many additional circumstances, convince any reasonable mind that the members of this secret society voted for Cimarron from corrupt motives. The returns from Logan township were *prima facie* regular and legal; but if all of the voters of that township had been members of this secret society, for the same reasons that 22 votes are rejected all the votes would have to be rejected. If the same rule be applied to the voters of Montezuma and Hess townships on account of the agreement with Soule to vote for Ingalls, all of the votes of those townships must be rejected excepting such as are shown not to have been improperly or corruptly influenced. This rule would reject all the votes in Montezuma and Hess townships cast for Ingalls, amounting to 431. In the "Equalization Society" a committee was appointed to go to Cimarron and make the arrangement about the votes of the members of the society. In this matter Dunlap and Reeve were active. A bond of

$10,000 was finally secured — some of the witnesses testifying the bond was a forgery. In Hess and Montezuma townships Soule met the voters in public meetings and conventions, and stated his propositions directly to them to induce them to vote for Ingalls. These propositions were finally accepted by the body of voters, and to complete the arrangements a committee was appointed by the voters to go to Ingalls. Mr. Ensign, Mr. Thompkins and Mr. Sayre were this committee. A bond of $75,000 was obtained from Soule. The voters of the "Equalization Society" were controlled by the promises of the friends of Cimarron and the bond of $10,000 which was given and accepted, and their votes are not, and ought not to be, counted. The voters of Hess and Montezuma townships were controlled by the promises of A. T. Soule and the friends of Ingalls, and the bond of $75,000 which was given and accepted, and their votes ought not to be counted.

XIV. It is stated in the opinion "That on account of the railroad scheme of Soule's the voters were not to get anything personal to themselves for anything they did or might do." It is well known in this state that the construction of railroads is largely aided by county, city, and township bonds. This is universally the case, not the exception. Railroad stock is issued in return for the bonds, but in all the branch or auxiliary roads the stock is comparatively worthless. The bonds to such roads are generally considered a donation. Soule's road was a small one, only 29 miles long. If the voters of Hess and Montezuma townships had been compelled, in order to obtain the construction of a railroad through their townships, to vote and issue bonds, then the bonds, principal and interest, would have had to be paid in yearly installments by taxes levied upon the property of the townships. Soule's agreement was to construct his road without any bonds, and without any cost whatever to the people of the townships; therefore the agreement of Soule, and the bond executed by him, were really for the personal and pecuniary benefit of the voters and tax-payers of Hess and Montezuma, and must have necessarily influenced them to vote for Ingalls corruptly, with-

out any regard to the public interest of the county, or the proper location of the county seat. In this connection it is proper for me to call attention to the fact that the construction of the railroad through Hess and Montezuma townships did not afford any railroad facilities to Ingalls, or in any way tend to the advantage or benefit of Ingalls as a convenient place for the county seat. Hess township joins Cimarron on the south, and Cimarron is more nearly located to the body of the voters of Hess township than Ingalls. At the time of the election of October 31, 1887, Cimarron township had twice the population of Ingalls township, and both Hess and Montezuma townships had a much larger population than Ingalls.

XV. Aside from all other matters in issue, I do not think that a majority of the votes cast by the legal and honest voters of Gray county were in favor of Ingalls. The answer of the defendants alleges "that in the township of Cimarron there were actually cast at said election on the question of the location of permanent county seat 432 votes, of which number about 100 were cast for Ingalls for county seat, and the balance were cast for Cimarron." This is a solemn admission in the answer of the defendants that in the township of Cimarron 332 votes were cast for Cimarron, and 100 for Ingalls. There is no testimony in the record attacking in any way the legality of these 332 votes. They cannot be thrown out or disregarded upon any theory. If the returns of Cimarron township are wholly disregarded on account of the frauds, illegalities and irregularities of the election officers of that township, 332 votes in Cimarron township must be given to Cimarron on account of the statement and admission of the answer, and only 100 to Ingalls. If the returns in Foote township be also excluded on account of the frauds of the election officers in that township, and the votes influenced by bribes and other corrupt or illegal means in Montezuma, Hess, and Logan townships be not counted, the actual result of the election for county seat in Gray county on October 31, 1887, would be as follows:

|  | INGALLS. | CIMARRON. |
|---|---|---|
| Montezuma | ... | 30 |
| Hess | ... | 60 |
| Ingalls | 137 | 17 |
| Cimarron | 100 | 332 |
| Logan | 69 | 13 |
| Totals | 306 | 452 |

This would give Cimarron 146 majority.

If all the votes of Hess and Montezuma are thrown out, the result is:

|  | INGALLS. | CIMARRON. |
|---|---|---|
| Ingalls | 137 | 17 |
| Cimarron | 100 | 332 |
| Logan | 69 | 13 |
| Totals | 306 | 362 |

This would still give Cimarron 56 majority. But as in Hess and Montezuma townships 90 votes were actually cast for Cimarron, those should be counted for that place, because they were not controlled by the corruption of Soule and the friends of Ingalls.

Again, in Cimarron 24 votes were cast for Ingalls, which are shown to have been cast by the voters personally bribed by friends of Ingalls. These should be deducted from the 100 votes in Cimarron claimed for Ingalls in the answer. With these corrections, the vote would stand:

|  | INGALLS. | CIMARRON. |
|---|---|---|
| Montezuma | ... | 30 |
| Hess | ... | 60 |
| Ingalls | 137 | 17 |
| Cimarron | 76 | 332 |
| Logan | 69 | 13 |
| Totals | 282 | 452 |

This would give Cimarron a majority of 170. This result throws out the returns of Foote and Cimarron townships, because of the frauds of the officers; the bribed votes in Logan, Cimarron, Hess, and Montezuma; and only counts the votes in Cimarron as stated by the answer, less the 24 taken from Ingalls on account of the bribery established by the testimony. In no way can Ingalls be "counted in" as the county seat, unless the votes of Hess and Montezuma townships, which were corruptly controlled by A. T. Soule, are counted in its favor.

XVI. When I first examined the report of the commission,

it seemed to me, according to its statements and conclusions of fact, that "neither party had shown a clear right beyond a reasonable doubt to the county seat of Gray county, and as neither party was in a condition to demand as matter of right anything from this court, therefore that the court should leave the parties where it found them." (*The State v. Marston*, 6 Kas. 524.) After a careful reading of the testimony, I think this court ought to say to the parties, as was said in the Marston case:

"When two parties (and we do not intend to apply this to the immediate parties in the case, but to the towns of Erie and Osage Mission) who have both by their fraudulent and wrongful acts put vast obstacles in the way of justice, and incumbered the case with embarrassing difficulties, invoke the aid of courts, the courts will not feel much inclined to assist to a very great extent, and especially not in an action of *mandamus*, where so much rests in the discretion of the court."

As the people of Gray county can soon determine by a legal election where their county seat shall be, I think the election heretofore held should be declared void, and the question left entirely with them. If, however, upon the testimony a permanent county seat is to be selected, then under the admissions of the answer, and giving proper weight to the influence exercised by the bribery and corrupt schemes of A. T. Soule and his agents, Cimarron has a majority of the legal and honest votes.

XVII. Although the record in this case consists of more than 3,000 pages of testimony reeking with fraud, corruption, and crime, I think the whole contest over the county-seat election in Gray county on October 31, 1887, may be summarized in a few words: The legislature in 1887 attached portions of Finney, Ford and Hodgeman counties to form Gray. For the temporary county seat Cimarron received 705 votes, Montezuma 560, and Ingalls 88 only. A. T. Soule, a man worth from $8,000,000 to $10,000,000, and living in New York, became interested in the town of Ingalls. Whether for his mere pleasure or his pecuniary profit it is difficult to say, he at-

11 — 42 KAS.

tempted to make Ingalls—a new and a very small place—
the county seat of the county. This resolution upon his part
I think was taken without any consideration of the interests or
rights of the people of Gray county. He supposed that with
his immense wealth he could locate the county seat wherever
he willed. The principal contesting towns for the county seat
up to within a few weeks before the election were Ingalls,
Cimarron, and Montezuma. Undoubtedly Montezuma was
the first choice for county seat of several hundred voters in
the southern part of Gray. During the campaign prior to the
election A. T. Soule and his agents were prodigal with their
corrupt funds with which to bribe voters for Ingalls. His
checks for that purpose of $1,000, $500, and other sums, were
distributed through the county. He said: "If any man can
tell me how much money it will take to buy the county seat,
I will freely pay it." The people of Gray county, like most
of the people in the frontier counties of the state, were not
blessed with an overabundance of property, and could not
compete, in bribing voters, with the money of Soule, even if
they were anxious to do so. As long as Montezuma was a
candidate it was impossible for Ingalls to succeed. Soule then
conceived the corrupt purpose of buying up by his railroad
scheme and bond of $75,000 the voters of Hess and Monte-
zuma townships, and thereby to withdraw Montezuma as a
contesting place. In this he succeeded. To carry out his
schemes of corruption more successfully, he and his agents im-
ported to the county before and on election day a crowd of
"toughs" and "killers." With this plethoric treasury, his
willingness and even anxiety to bribe any one and every one,
and with this crowd of imported "toughs" and "killers" to
bulldoze the honest and peaceful voters of the county, it is ab-
solutely surprising, I think, that Soule and his agents did not
obtain more election returns from the voting precincts in Gray
county showing *prima facie* majorities for his town for county
seat. Some of the persons interested in Cimarron, who had
"borne all the discomforts of pioneer life, and who made many
sacrifices to build up a town, with the fond hope that some

day it would be the county seat, and that they would be remunerated by the increased value of their property," saw in the notorious schemes of bribery and corruption inaugurated by A. T. Soule, and in the threats of violence offered, "their future prospects darkened." To counteract these schemes they committed the wrongs detailed against them. While I join the commission and the court in condemning with all possible judicial severity these wrongs, yet I can, I think, clearly comprehend that these illegal acts of omission and commission were caused to a large extent by the unparalleled iniquity of Soule and his agents. If they had never corruptly or violently interfered in the county-seat contest of Gray county, I do not think that the trouble, turmoil and bloodshed which have disgraced and destroyed the reputation of that county would have ever existed. Under all the facts disclosed in the testimony, it seems to me that the best and wisest thing for a court to do in such an election contest as this is to declare the whole election a nullity; to repeat what has been heretofore so well said: "That courts are established principally for the protection of innocence and justice, and not for the protection of supposed rights founded upon fraud and injustice."

XVIII. My brothers, who have conscientiously examined the testimony, are of the opinion that the election was valid, and that Ingalls by its result has become the county seat. I am grieved to differ in such a case as this; but the facts as I understand them impress me so strongly and forcibly that all the proceedings in Gray county on October 31, 1887, were such a travesty on justice and such a burlesque on elections, that I cannot assent to the judgment rendered. I very greatly regret the result announced in the opinion, because I do not think that any election should stand which was conducted and carried on by the voters—or rather, by "non-residents"—as was the election of October 31, 1887. I greatly regret the result, because I fear its consequences upon the future elections in the state, and because I fear that A. T. Soule, and such "conscienceless scoundrels" as operated fraudulently and cor-

ruptly in Gray county on October 31, 1887, may be emboldened to attempt other schemes of fraud, corruption, and violence.

Speaking for myself, I believe the judgment should be vacated, and a new trial granted.